***********
The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Ledford and the briefs and arguments before the Full Commission. Upon reconsideration of the evidence the Full Commission AFFIRMS with some modifications the Opinion and Award of the Deputy Commissioner. ***********
The Full Commission finds as fact and concludes as matter of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as: *Page 2 
 STIPULATIONS
1. The parties were subject to and bound by the Workers' Compensation Act at all relevant times.
2. An employment relationship existed between plaintiff and defendant-employer at all relevant times.
3. On February 3, 2000, and at all relevant times, defendant-employer was insured by Reliance National, with Sedgwick Claims Management Services as the servicing agent.
4. Plaintiff's average weekly wage was $636.44, which yields a compensation rate of $424.32 per week.
5. February 3, 2000 is the date of the alleged injury by accident.
6. The issues before the Full Commission are whether plaintiff sustained a compensable injury by accident on February 3, 2000 that resulted in post-traumatic stress disorder (PTSD) and, if so, what benefits she is entitled to receive.
 ***********
Based upon the competent evidence of record herein, the Full Commission makes the following:
 FINDINGS OF FACT
1. On the date of the Deputy Commissioner's hearing, plaintiff was 44 years of age, with a birth date of June 6, 1956. Plaintiff is a high school graduate. On April 20, 1977, plaintiff began working as a flight attendant and last worked as a flight attendant on February 3, 2000, the date of the alleged injury by accident. *Page 3 
2. Plaintiff worked for defendant-employer on the "princess plan," working six to eight days and approximately 55 hours per month. Plaintiff wanted to work this schedule so that she could have more time at home with her young daughter.
3. Plaintiff's husband was a pilot for defendant-employer. He had health problems, including high blood pressure and stress, and, as of the Deputy Commissioner's hearing, had been on a mandatory FAA medical leave for almost four years.
4. Prior to February 3, 2000, plaintiff and her husband experienced marital difficulties and participated in marital counseling with Bill Tillery, L.C.S.W. Plaintiff also received individual counseling with Camille Smith, L.C.S.W., from November 1999 to March 2000. The stress between plaintiff and her husband was largely focused on who would stay home to care for their daughter. Plaintiff wanted to quit work to stay home with her daughter, but her husband wanted his wife to continue working because he was on medical disability. This issue became a significant source of stress between plaintiff and her husband, as plaintiff felt that her husband was usurping her role as a mother.
5. Prior to February 3, 2000, Ms. Smith assessed and the Full Commission finds that plaintiff suffered from generalized anxiety disorder, under the criteria established in DSM IV. Plaintiff's anxiety was present for longer than the six months required for diagnosis. In Ms. Smith's assessment, plaintiff probably felt anxious all of her life. Symptoms of plaintiff's anxiety included restlessness, difficulty concentrating, irritability, muscle tension and sleep disturbance.
6. A short time before February 3, 2000, an Alaska Airlines jet crashed and many people died. Plaintiff testified that the accident caused unusual tension among defendant-employer's *Page 4 
flight crew. The reason for the crash had not been determined by the time plaintiff was scheduled for a three-day flight from Charlotte to Seattle and from Seattle to Philadelphia.
7. Plaintiff testified that the pilot assigned to captain her three-day flight was difficult, uncommunicative and kept the staff "in the dark" on both the flight to Seattle and the flight to Philadelphia. On the flight to Seattle, the captain complained about the lead flight attendant, which created tension among the flight crew. In addition, he did not follow standard procedures such as pre-flight discussion with the flight crew, talking over the public address system to passengers and flight attendants during flight, and sounding the warning bell to prepare for landing. When they landed in Seattle, he was "rude" to the first officer. Plaintiff testified that the captain's attitude and lack of communication did not foster a feeling of confidence for her, especially in view of the recent Alaska Airlines tragedy.
8. Once in Seattle, on February 3, 2000, plaintiff overheard the captain saying that he had been very tired the day before and barely landed the airplane. These statements caused plaintiff increased anxiety. The flight to Philadelphia was delayed due a mechanical problem and passengers were told the plane had hydraulic problems. However, plaintiff learned this information from the first officer, not the captain. Prior to the delayed take-off, the captain never provided the flight attendants with any explanation of the problem or verification of repair. As the plane took off, the captain banked the plane abruptly, causing the staff and passengers to be pushed back against their seats. Plaintiff testified that she had never experienced a take-off like that before. After take-off, the captain did not come on the public address system to speak to the passengers and flight attendants, as was customary.
9. Once the flight was underway, the flight attendants proceeded to serve the passengers. Several hours into the flight, plaintiff sat down to rest. Plaintiff had been sitting less *Page 5 
than five minutes when the lights went out and the captain shut down the right engine. Plaintiff was sent to the cockpit to check with the captain, who told her to get the lead flight attendant because there was a fire in the engine and he had to get the plane on the ground. Plaintiff testified that she had never been in such an emergency situation. She was terrified and angry with the captain over his behavior and lack of communication and she "fell apart."
10. The flight attendants began preparing for an emergency crash by making sure that able-bodied persons were seated at all emergency exits and by instructing the passengers on the brace position and emergency procedures. For the first time during the flight, the captain came on the public address system and told the approximately 150 passengers that they were having an emergency situation, he had 15 minutes to get the plane on the ground, and that they were diverting to Dulles Airport. After the plane landed safely at Dulles Airport in Washington, D.C., passengers were crying and distraught.
11. Upon landing at Dulles, the captain greeted plaintiff and the flight crew in a nonchalant manner and acted as though the emergency landing was an everyday occurrence. Plaintiff testified that the captain also tried to give the flight attendants a hug, said that they had gotten on the ground and suggested they go to the bar and talk about it. Plaintiff was upset with the captain and she did not want to talk to him. The captain stated that he wanted to go to the back to see where the flames had been.
12. A hotel van picked up the flight crew at the airport. Plaintiff testified that she was distraught, "in a fog," unable to focus and just wanted to talk to her family. Plaintiff's concerns were intensified by her anger at the lack of professionalism of the captain and other defendant-employer's staff. She testified that she needed time to get back to a position of confidence. *Page 6 
13. At the time of the Deputy Commissioner's hearing, plaintiff had not worked at all since the incident on February 3, 2000. In November 2000, plaintiff began drawing long-term disability benefits in the amount of $1,200.00 per month. She did not draw short-term disability benefits. There is insufficient evidence in the record concerning whether defendant-employer provided the benefits or whether plaintiff paid a portion of the premiums.
14. On February 7, 2000, plaintiff met with counselor Camille Smith. Plaintiff discussed the incident on February 3, 2000 and her anger over the captain's behavior. Ms. Smith noted that plaintiff had a tendency to blame others for her problems. Plaintiff met with Ms. Smith again around February 14. 2000. On this occasion, plaintiff focused the discussion on her relationship with her husband and Ms. Smith did not record anything about the February 3, 2000 incident in her notes.
15. On February 16, 2000, plaintiff called Ms. Smith and asked for a medical leave note so that she could get a business started. Ms. Smith told plaintiff that she could only write a note if plaintiff was unable to fly. Ms. Smith encouraged plaintiff to confront her fears and attempt to return to flying, as she did not believe it was in plaintiff's best interest to avoid flying. Ms. Smith did not diagnose plaintiff with PTSD, since plaintiff did not present with any new symptoms of PTSD. Ms. Smith noted that plaintiff declined to participate with the pilots and flight attendants in a post-incident debriefing, which might have helped her process the event at the time.
16. After she returned home to Tennessee, plaintiff's pre-existing anxiety symptoms continued and worsened. She had no confidence in flying and did not believe she could return to work as a flight attendant. Around the end of March 2000, it was discovered that Ms. Smith was not an authorized *Page 7 
provider under plaintiff's medical insurance, and Ms. Smith could no longer provide covered counseling services.
17. Plaintiff then had two visits with Diana DePugh, L.C.S.W., who contracted with defendant-employer to provide employee assistance, such as short-term counseling. Plaintiff saw Ms. DePugh on March 27, 2000, at which time she related the events of February 3, 2000. Ms. DePugh testified that plaintiff was staring off and had a look of terror like she was re-experiencing the event. Ms. DePugh also testified that in 23 years of clinical practice, she had only seen one other person with those symptoms. She believed plaintiff would need long-term counseling and referred her to Dr. Arvell S. Luttrell, a licensed psychiatrist.
18. Plaintiff first met with Dr. Luttrell on April 18, 2000. During his career, Dr. Luttrell has worked with 200-300 PTSD cases, many of them soldiers returning from stressful combat situations. Dr. Luttrell assessed plaintiff with PTSD. In both his office notes and deposition, Dr. Luttrell documents and corroborates the history of the February 3, 2000 incident and its impact on plaintiff's ability to work in 2000. Dr. Luttrell diagnosed plaintiff with a "classic case of acute post traumatic stress disorder," characterized by numerous objective symptoms.
19. At the time he began treating her, Dr. Luttrell was unaware that plaintiff had previously been assessed with generalized anxiety disorder. Dr. Luttrell acknowledged that the symptoms of generalized anxiety were also present with PTSD, but testified that with PTSD, those anxiety symptoms would be exaggerated. Dr. Luttrell was also unaware that plaintiff and her husband had been in marital counseling at the time of the February 3, 2000 incident. He did not know that plaintiff's husband was on medical leave from his job as a pilot and thought that he was still flying. Dr. Luttrell acknowledged that he would want to have a complete and *Page 8 
accurate history on any new patient, and that these were matters which could affect his assessment, including any possible motives for not to returning to work or malingering.
20. Despite this lack of information, Dr. Luttrell was adamant in his assessment that plaintiff suffers from PTSD brought on by the incident of February 23, 2000, and that she is not malingering. He testified that, in his opinion, plaintiff is motivated to return to work. Dr. Luttrell did not change his opinion after learning about plaintiff's prior diagnosis of general anxiety disorder.
21. Dr. Luttrell began a treatment plan to help plaintiff conquer her fears, so that she could return to work as a flight attendant. The treatment plan included going to the airport and taking a flight as a passenger, which plaintiff completed. Dr. Luttrell testified that plaintiff was not able to work as a flight attendant at that time, but he was hopeful that with a year of treatment, which would have been June 2002, she could return to work. He also testified that plaintiff's PTSD would not prevent her from working in some other capacity, even if not in the airline industry.
22. Despite evidence of plaintiff's pre-existing generalized anxiety disorder and her prior motivation to stay home with her daughter, the Full Commission finds that Dr. Luttrell's testimony supports plaintiff's position that she developed PTSD as a result of the February 3, 2000 incident. Dr. Luttrell's testimony is not contradicted by any other counselor or psychiatrist, and must be given weight.
23. The Full Commission finds that the February 3, 2000 incident involving an engine fire and emergency landing was not a normal part of plaintiff's work routine, but constituted an interruption of her normal work routine. The greater weight of the evidence establishes that plaintiff developed PTSD arising out of the incident on February 3, 2000. As a consequence of *Page 9 
her PTSD, from February 3, 2000 until June 2002 which was the end of the one-year period Dr. Luttrell anticipated plaintiff needed before she could return to work, plaintiff was unable to return to her employment as a flight attendant and was in need of additional treatment for PTSD. Dr. Luttrell expected that plaintiff would be able to return to work as a flight attendant or in some other capacity, but, since the evidence of record was completed in October 2001, there is no evidence regarding plaintiff's return to work status or whether plaintiff has returned to work in some capacity since that time.
24. After the close of the record in October 2001, issues arose regarding the pending bankruptcy of defendant-employer and a stay regarding any claims against defendant-employer. Consequently, this matter was held at the Commission pending release of the stay. Due to the lengthy delay between the close of the evidence and the issuance of the Deputy Commissioner's Opinion and Award and subsequent review by the Full Commission, the Full Commission needs additional evidence upon which to base its decision concerning the extent, if any, of plaintiff's continuing disability after June 2002.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. On February 3, 2000, plaintiff was involved in an "unexpected, unusual or undesigned occurrence" arising out of and in the course of her employment as a flight attendant, when the plane's engine caught on fire and had to be shut down, resulting in an emergency landing.Edwards v. Publishing Co., 227 N.C. 184, 186, 41 S.E.2d 592, 593 (1947). This event *Page 10 
constitutes a compensable injury by accident arising out of and in the course of plaintiff's employment with defendant-employer. N.C. Gen. Stat. § 97-2(6).
2. Post-traumatic stress disorder is an anxiety condition that results following an event that is outside the normal range of human events.Jordan v. Central Piedmont Community College, 124 N.C. App. 112,476 S.E.2d 410 (1996). In the present case, plaintiff's experience on February 3, 2000 was outside the normal range of human events and resulted in the development of PTSD. As a consequence of the February 3, 2000 accident and her PTSD, plaintiff was not able to return to her prior employment as a flight attendant.
3. As a result of the injury by accident on February 3, 2000, plaintiff was disabled from any employment and is entitled to receive temporary total disability compensation at the rate of $424.32 per week, beginning February 3, 2000 and continuing through June 2002, which represents the end of the one-year time frame within which Dr. Luttrell initially anticipated that plaintiff might return to work. N.C. Gen. Stat. § 97-29. Further evidence is necessary to determine the extent, if any, of plaintiff's disability after June 2002.
4. Plaintiff is entitled to all medical expenses incurred or to be incurred as a result of her compensable injury, including counseling and therapy to treat her PTSD, for so long as such examinations, evaluations and treatments may reasonably be required to effect a cure, give relief or tend to lessen plaintiff's period of disability. The treatment provided by Dr. Luttrell has been reasonably necessary and defendants are responsible for providing the same. N.C. Gen. Stat. §§ 97-2(19);97-25.
5. Where it is not clear that the defendant-employer paid premiums for the long-term disability policy under which plaintiff has been paid benefits, it is inappropriate to allow any credit for such payments, pursuant to N.C. Gen. Stat. § 97-42. *Page 11 
 ***********
Based upon the foregoing stipulations, findings of fact, and conclusions of law, the Full Commission enters the following:
 AWARD
1. Defendants shall pay plaintiff temporary total disability compensation at the rate of $424.32 per week, beginning February 3, 2000 and continuing through June 2002. This compensation has accrued and shall be paid in a lump sum, subject to the attorney's fee approved below.
2. Defendants shall pay all related medical expenses incurred or to be incurred by plaintiff as the result of her injury by accident, including counseling and therapy to treat her PTSD, for so long as such examinations, evaluations and treatments may reasonably be required to effect a cure, give relief or tend to lessen plaintiff's period of disability. Defendants shall pay the expenses incurred for plaintiff's therapy with Dr. Luttrell and for any other reasonably necessary treatment he may prescribe or refer plaintiff to for her PTSD, including treatment by another therapist. Defendants are not responsible for providing plaintiff and her husband counseling for pre-existing marital problems.
3. A reasonable attorney fee of 25% of the compensation due plaintiff under paragraph 1 of this Award is approved for plaintiff's counsel and shall be paid directly to plaintiff's counsel.
4. Defendants shall pay the costs.
 *********** *Page 12 ORDER
IT IS HEREBY ORDERED that this case shall be reopened to obtain additional evidence to determine the extent, if any, of plaintiff's disability after June 2002. In lieu of submitting additional evidence, the parties may stipulate to a period of disability, if any. If the parties elect to take further depositions, the parties shall have 60 days from the date this Interlocutory Opinion and Award is filed within which to take the necessary depositions. The Full Commission retains jurisdiction over this case, and upon receipt of the transcripts of the depositions, the Full Commission will render a final decision concerning the extent of plaintiff's disability, if any, after June 2002.
This 10th day of January 2007.
 S/___________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
CONCURRING:
 S/___________________ CHRISTOPHER SCOTT COMMISSIONER
 S/___________________ DIANNE C. SELLERS COMMISSIONER *Page 1